# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Jessica S. Allen |
| v. | : | Mag. No. 21-8352 (JSA) |
| JOHN KLEIN | : | **CRIMINAL COMPLAINT** |

I, Kelly S. Blanchfield, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Kelly S. Blanchfield, Special Agent
Federal Bureau of Investigation

Special Agent Blanchfield attested to this Complaint by telephone pursuant to FRCP 4.1(b)(2)(A).

December 2, 2021 at
Newark, New Jersey

HONORABLE JESSICA S. ALLEN      _____
UNITED STATES MAGISTRATE JUDGE   Signature of Judicial Officer

Signed by Special Agent at Judge Allens's direction pursuant to F.R.C.P. 4.1(b)(6)(C).

## **ATTACHMENT A**
### **(Wire Fraud)**

From in or around May 2016 to in or around January 2017, in Bergen County, in the District of New Jersey and elsewhere, the defendant

### JOHN KLEIN

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud Company-1 and to obtain money and property from Company-1 by means of materially false and fraudulent pretenses, representations, and promises, and, for purposes of executing and attempting to execute such scheme and artifice to defraud, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, to wit, an email sent on or about January 25, 2017, from a location outside of New Jersey to a location inside of New Jersey.

In violation of Title 18, United States Code, Sections 1343 and 2.

**ATTACHMENT B**

I, Kelly S. Blanchfield, being first duly sworn, depose and state the following:

I. **Introduction and Agent Background**

    1.    I am a Special Agent with the Federal Bureau of Investigation. I am familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, including an agent from Internal Revenue Service Criminal Investigation, and my review of reports, documents, and other evidence. Because this Complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where statements of others are related herein, they are related in substance and in part unless otherwise indicated. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

II. **Background of Relevant Individuals and Entities**

    2.    At various times relevant to this Complaint:

        a.    The defendant, JOHN H. KLEIN ("KLEIN") was a resident of Bergen County, New Jersey.

        b.    Company-DE was a Delaware limited liability company formed on May 4, 2011. The principal address of Company-DE was in Teaneck, New Jersey.

        c.    Company-NJ was a New Jersey limited liability company formed on June 7, 2011 and merged into Company-DE on or about June 2, 2016.

        d.    KLEIN was the majority shareholder and CEO of Company-DE and Company-NJ, collectively referred to throughout this Complaint as "Company-1." Company-1 was a pharmaceutical company whose core business included buying generic prescription drugs at wholesale prices and packaging them for resale.

        e.    Investors-1 and -2 were residents of Illinois that invested in and were minority shareholders of Company-1.

        f.    Investment Group-1 is an investment group co-owned by Investors-1 and -2.

        g.    Advisor 1 was a resident of Illinois and served as an

      investment advisor to Investors -1 and -2 and as CFO of Investment Group-1.

  h. Individual-2 was a licensed attorney who served as Company-1's Executive Vice President of Business Development, Legal, and Regulatory Affairs.

  i. Individual-3 served as Company-1's Chief Financial Officer.

  j. Individual-4 was a Company-1 investor who also served as an Executive Vice President at Company-1 and was a member of Company-1's Board of Directors.

### III. Overview

3. Beginning in or around September 2017, the FBI has investigated a fraudulent scheme perpetrated by KLEIN through his ownership of Company-1. As set forth herein, as a result of that investigation, there is probable cause to believe that KLEIN misappropriated approximately millions of dollars from Company-1 for his personal use.

### IV. Investors-1 and -2's Investment in Company-1

4. On or about June 15, 2016, Investors-1 and -2 agreed to invest $12.5 million in Company-1. The transaction closed on the same day, when Company-1 and Investors-1 and -2 entered into a Unit Purchase Agreement ("UPA"), an Operating Agreement, and an Amended Employment Agreement for KLEIN (the "Amended Employment Agreement"). Investors-1 and -2 paid the first $7.5 million via wire transfer on June 15, 2016 and the remaining $5 million via wire transfer on July 20, 2016. The signatories to the UPA were Investors-1 and -2, Individual-2 (signing on behalf of Company-1), and KLEIN (signing in his capacity as "founder" of Company-1).

5. The Amended Employment Agreement described in detail KLEIN's agreed-upon salary and other benefits and future income due to KLEIN from Company-1. Specifically, the Amended Employment Agreement stated that: (a) KLEIN would be paid a base salary of $100,000 per month; (b) KLEIN's salary would "be paid not less frequently than bi-weekly in accordance with the Company's standard payroll practices;" and (c) KLEIN would be eligible to receive a "cash bonus equal to 100% of Salary paid to [KLEIN]," which would be based upon Company-1 achieving certain earnings to be set by Company-1's Board of Managers.

6. In addition, the UPA set forth terms permitting the repayment of debt to Klein. The only payment made pursuant to these terms occurred on or about September 21, 2016 when a wire transfer was initiated from a Company-1 bank account ending in 4938 and was received on or about September 26, 2016 into an account held by KLEIN at Bank-1 ending in 1828.

7.     Further, according to records provided by a payroll company used by Company-1 for automated salary payments, KLEIN received bi-weekly salary payments of $50,000 starting on June 30, 2016, approximately two weeks after Investor-1 and -2's investment with Company-1. The payments were received into an account held by KLEIN personally at Bank-1 ending in 1828. Based on this investigation, Company-1 did not achieve sufficient earnings in the calendar years 2016 or 2017 for KLEIN to have received a bonus from Company-1 under the Amended Employment Agreement.

V.     **KLEIN Misappropriated Millions from Company-1**

8.     In or around July 2016, following Investor-1 and -2's investment, Individual-3 was hired as Company-1's CFO. After being hired as Company-1's CFO, Individual-3 used information, including information provided by KLEIN, to create a profit and loss statement showing Company-1's sales and corresponding receivables, or money owed to Company-1 from Company-1's customers.

9.     According to Individual-3, the information provided by KLEIN included an account receivable of approximately $3.9 million from a prescription drug distribution company (the "Drug Distribution Company") that had not been collected by Company-1. According to Individual-3, KLEIN provided information that showed product(s) had been sold to the Drug Distribution Company by Company-1, but no information demonstrating that the Drug Distribution Company had paid Company-1 for the product(s).

10.    On or about August 18, 2016, Individual-3 emailed KLEIN and Individual-4 regarding Company-1's accounts receivable. Individual-3 attached a file purporting to show customer deposits received into an account held by Company-1 at Bank-2 ending in 1331 since the account's reception. Individual-3 noted a total open receivable of $6.4 million on sales of the product sold by Company-1 to the Drug Distribution Company and stated, "my recommendation is that we STOP selling products to these customers until they clear up their outstanding balances." KLEIN responded the following day, on August 19, 2016, and stated, "Let's talk about this today after noon."

11.    According to Individual-3, as the Drug Distribution Company's account aged, Individual-3 and KLEIN discussed putting a reserve against the account as "uncollectible." According to Individual-3, KLEIN agreed with Individual-3 that the account was uncollectible and further agreed to put a reserve against the Drug Distribution Company receivable. The investigation further revealed that in or around December 2016, KLEIN instructed Individual-3 to write off the uncollected receivable against the Drug Distribution Company as bad debt.

12.    On or about January 25, 2017, Individual-3 emailed Adviser-1 and copied KLEIN and Individual-2 (the "January 25, 2017 Email"). The January 25, 2017 Email referred to an upcoming Company-1 board meeting on January

27, 2017 and attached an analysis of Company-1's financial forecast for 2017. In response to the January 25, 2017 Email, Advisor-1 responded, in relevant part, "It looks like you wrote off all of [the Drug Distribution Company]'s [account/receivable] balance? What's going on there?...How much have you collected in total since our last conversation?" Individual-3 has stated in substance and in part that he discussed the contents of the January 25, 2017 Email with Klein prior to sending it and would not have sent the January 25, 2017 Email absent Klein's instruction to send the email.

13. On or about January 27, 2017, Company-1 held a regular meeting of its members and Board of Managers (the "January 27 Board Meeting") at which KLEIN, Individual-2, Individual-3, Advisor-1, and Investors-1 and -2 were each present in person. Following the January 27 Board Meeting, a Company-1 accounts receivable "aging summary" was updated to reflect that $3,853,070 due to Company-1 from the Drug Distribution Company was classified as an "allowance for doubtful account," or an account that Company-1 did not expect to be able to collect from.

14. According to board minutes of the January 27 Board Meeting, Individual-3 "discussed the Company's fourth quarter and year-end financial results...[and] reported a fourth quarter loss of $5.3 million, which included...a bad debt reserve of $3.9 million with respect to uncollected Diclofenac gel sales..." Based on this investigation, the bad debt reserve of $3.9 million referred to the money allegedly owed to Company-1 from the Drug Distribution Company, which previously purchased supplies of Diclofenac gel from Company-1. The board minutes of the January 27 Board Meeting further stated the following:

> Discussion ensued concerning the Company's year-end receivables associated with the gel products. [Individual-3] provided detail around the three accounts that comprised the receivables, [the Drug Distribution Company] ...and the various issues associated with those accounts. The Board of Managers next discussed whether to pursue these collections as a legal vs. business matter. The Board of Managers next discussed business procedures to ensure that this doesn't happen again, including credit and background checks for large sales.

## VI. The 5904 Account

15. The investigation has revealed that prior to and while Individual-1 and Individual-2 were negotiating to invest in Company-1, KLEIN controlled and used a bank account at Bank-2 ending in 5904 (the "5904 Account") in furtherance of Company-1's business. A review of the 5904 Account revealed that the Drug Distribution Company made two wire transfers into the 5904

5

Account on May 3, 2016 and May 17, 2016, totaling approximately $3.9 million (the "May 2016 Payments"). Based on this investigation, the $3.9 million paid by the Drug Distribution Company into the 5904 Account was the same receivable designated as "uncollectible" by Individual-3 in late-2016 and later written off as bad debt at the instruction of KLEIN in or around December 2016.

16. Further investigation revealed that on or about May 6, 2016, KLEIN sent an email to Individual-5, an employee at a company responsible for the distribution of Company-1 products. In the body of the email, KLEIN indicated that the Drug Distribution Company had paid approximately $3,853,070 due to Company-1, the amount that was later written off as uncollectable as described above.

17. On or about June 5, 2016, KLEIN emailed Individual-5 again with the subject line "Invoicing for 3% Gel Products." In the body of the email, KLEIN listed the invoices for the approximately $3.9 million, which he designated as "paid in full."

18. An analysis of the 5904 Account further revealed that following the $3.9 million Drug Distribution Company payments in May of 2016, KLEIN made numerous personal expenditures out of the 5904 Account, including, but not limited to: (a) credit card payments for his own and his wife's American Express accounts; (b) payment of property taxes on KLEIN's home in Alpine, New Jersey; and (c) tuition payments for KLEIN's child's private school. Additionally, KLEIN made several payments to a previous Company-1 investor totaling approximately $350,000.

19. According to Individual-3, after learning of the Drug Distribution Company's and other deposits into the 5904 Account, Individual-3 directed another accountant at Company-1 to reverse the Drug Distribution Company write off and set up a receivable against KLEIN. Individual-3 then inserted a line item into Company-1's financials that read "due from founder" to account for the Drug Distribution Company payments.